# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELLA D. VICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-2193 (TSC) |
| | ) | |
| MEGAN J. BRENNAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

In this action, Plaintiff Ella D. Vick alleges sex discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a (the "ADEA") and violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA"). Defendant, the United States Postal Service (the "USPS"),[1] now moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56 (the "Motion").

Upon consideration of the Motion, Plaintiff's opposition thereto, and Defendant's reply in support thereof, and for the reasons set forth below, the Motion is hereby **DENIED.**

---

[1] The original named Defendant in this action, Patrick R. Donahoe, was sued only in his official capacity as the Postmaster General of the USPS. He has since been succeeded by Megan J. Brennan. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name.").

I.     **FACTUAL BACKGROUND**[2]

Plaintiff, who was born in 1956, worked for the USPS from 1986 through her retirement, which took place sometime after February 2013.  After working her way up from a mail processing position, Plaintiff was promoted in 2008 to the position of Manager of Distribution Operations ("MDO") at the Joseph Curseen, Jr. and Thomas Morris, Jr. Processing and Distribution Center ("JCTM") in Washington, D.C.  She held this position for most of the time period relevant to this case.

Plaintiff was the MDO for the "Tour One" shift at JCTM.  She alleges that, for most of the time period relevant to this case, (i) Lonzine Wright was the junior MDO on Tour One, where she and Plaintiff "occupied the same position, shared the same duties and managed the same personnel," even though Wright's official title was "Customer Services Manager" (Compl. ¶¶ 7, 11); (ii) Sherrod Stanard was the Tour Two MDO; and (iii) Rosetta Watkins was the Tour Three MDO.  Watkins is approximately thirteen years older than Plaintiff, Stanard is approximately ten years younger than Plaintiff, and Wright is either ten or twenty years younger than Plaintiff.[3]

---

[2] For the reasons set forth in Part A of the "Analysis" section of this Memorandum Opinion, the court will deny the Motion insofar as it seeks summary judgment on any of the counts of the Complaint, and will permit Plaintiff to seek discovery.  Therefore, the court will substantively address only the Motion's arguments for Rule 12(b)(6) dismissal, and not its arguments for summary judgment, which Defendant may renew after discovery has been completed.

Because the court treats the Motion as a Rule 12(b)(6) motion and not a summary judgment motion, this "Factual Background" section will draw only from the allegations on the face of the Complaint and the content of Plaintiff's EEO Complaint (ECF No. 5-3 at 20-26), which is referenced in the Complaint.  *See Hudson v. Children's Nat. Med. Ctr.*, 645 F. Supp. 2d 1, 5 n.5 (D.D.C. 2009) (where a plaintiff references an EEO complaint in his or her federal court complaint, the court may consider the EEO complaint without converting the defendant's motion to dismiss into a motion for summary judgment) (citations omitted).

[3] Plaintiff alleges both that Wright was born in 1968 (*see* Compl. ¶ 7), and that she was 31 years old in June 2009, which would mean that she was born in 1978 (*see id.* ¶ 9).  This discrepancy

This case involves allegations that Plaintiff's supervisor, JCTM Plant Manager Wendy McLlwain, subjected Plaintiff to a hostile work environment for discriminatory and retaliatory reasons, repeatedly attempting over several years to orchestrate her termination from the USPS, and "attacking, harassing, and threatening her" on a regular basis.  (*Id.* ¶ 9).

A.   The Origin Of McLlwain's Alleged "Personal Vendetta" Against Plaintiff

Plaintiff alleges that McLlwain's "personal vendetta" against her began some time in 2008.  (*Id.* ¶ 8).  Prior to being promoted to JCTM Plant Manager, McLlwain worked there as the Tour Three MDO.  Plaintiff alleges that McLlwain supervised her "live-in male companion" in that role, and was angry at Plaintiff because Plaintiff was promoted to the Tour One MDO position instead of McLlwain's paramour.  (*Id.*).

B.   McLlwain Allegedly Attempts To Orchestrate Plaintiff's Termination In 2009

Plaintiff alleges that in May 2009, she received a General Reduction-in Force ("RIF") Notice stating that "there may be a reduction of the number of authorized positions within her competitive area at JCTM."  (*Id.* ¶ 9).  In June 2009, Plaintiff received a Specific RIF Notice stating that "she would be released from her MDO position and separated from the USPS effective August 28, 2009, and [that] she would have to apply for an MDO position."  (*Id.*).  Plaintiff attributes these RIFs to McLlwain.  (*See id.* ¶ 11 (noting that "McLlwain was unsuccessful in her attempts in 2009 to RIF" Plaintiff)).  Plaintiff subsequently applied for an MDO position, but McLlwain denied her application and selected Wright instead.

Around this time, Plaintiff took FMLA leave due to the stress brought on by McLlwain "attacking, harassing, and threatening her on a daily basis, and issuing her disciplinary actions

_____

does not impact the court's analysis as, either way, Plaintiff alleges that Wright is significantly younger than she is.

trying to remove her from her MDO position." (*Id.* ¶ 9).[4]  Plaintiff also filed an EEO complaint

regarding the selection of the more junior Wright for the MDO position.  Plaintiff prevailed in

her EEO proceeding and retained her position as the Tour One MDO, where she continued to

work under McLlwain's supervision.  The USPS took no action against McLlwain, who

proceeded to retaliate against Plaintiff by beginning "a barrage of personal attacks against [her]

in an effort to . . . cause her termination from employment."  (*Id.* ¶ 10).

　　　Plaintiff eventually requested to be reassigned to the vacant MDO position on Tour Two,

which she characterizes as "the least difficult tour," but McLlwain denied her request and told

her there was no need for a Tour Two MDO.  (*Id.* ¶ 8).  Months later, however, McLlwain

reassigned Stanard to be the Tour Two MDO, even though he was junior to Plaintiff.  Plaintiff

alleges that McLlwain and Stanard are "involved in an intimate personal relationship," but does

not allege whether the relationship began before or after Stanard's assignment to the Tour Two

MDO position.  (*Id.*).

　　　C.　McLlwain Allegedly Attempts To Orchestrate Plaintiff's Termination Again In 2010

　　　Plaintiff alleges that McLlwain tried once again to orchestrate her termination in 2010,

when she announced that she needed only three MDOs at JCTM, meaning that either Plaintiff,

Wright, Stanard or Watkins would lose their job.  (*Id.* ¶ 11).  McLlwain interviewed all four

MDOs, ostensibly to identify the three best qualified candidates.  Plaintiff learned at some point

that McLlwain had distributed a list of interview questions and answers to Wright and Stanard

(the two younger MDOs) to ensure they would be selected, but not to Plaintiff and Watkins

---

[4] While the Complaint's discussion of the events of 2009 states only that "Plaintiff requested
FMLA leave" (Compl. ¶ 9), the Complaint later refers to Plaintiff taking FMLA leave "again"
in 2011 (*id.* ¶ 12).  Because there is no mention of Plaintiff taking FMLA leave during the
intervening period, the court reads these allegations to mean that Plaintiff did not just request
FMLA leave in 2009, but that she actually took such leave.

(the two older MDOs).  After the interviews, McLlwain selected Wright and Stanard to keep

their jobs.  Plaintiff alleges that, even without receiving the questions and answers in advance,

she and Watkins were still able to answer all of McLlwain's questions during their interviews,

but that only Watkins was selected to keep her job because McLlwain "was still trying to

retaliate [against] and terminate" Plaintiff.  (*Id.*).  Plaintiff then sought assistance from an HR

Manager, who forced McLlwain to reinstate Plaintiff to her MDO position.

###### D.   McLlwain Allegedly Attempts To Orchestrate Plaintiff's Termination Again In 2011

After being assigned to a different facility for a time, McLlwain returned to JCTM in

February 2011.  Plaintiff alleges that McLlwain eventually resumed "her barrage of attacks,"

seeking yet again to orchestrate Plaintiff's termination.  (*Id.* ¶ 12).  Plaintiff alleges that the

attacks became so severe, and the resultant stress so great, that she took FMLA leave again from

March through May 2011.  She also requested a transfer to another facility, but the Plant

Manager of that facility denied her request.

###### E.   McLlwain Allegedly Denies Plaintiff  FMLA Leave And Suspends Plaintiff In 2012

In March 2012, Plaintiff's mother was diagnosed with lung cancer, and Plaintiff was

granted FMLA leave to be with her – her third time taking such leave since 2009, though the first

two times were because of work-related stress.  As her mother's cancer progressed, Plaintiff

requested additional leave.  McLlwain denied her request and instructed her to return to duty.

Plaintiff's mother died approximately one week later.  While it is not clear exactly how long

Plaintiff was on FMLA leave before McLlwain ordered her to return to work, the court construes

Plaintiff's allegations as meaning that she was still eligible for more FMLA leave at the time that

McLlwain ordered her to return to work.  (*See id.* ¶ 48 (alleging that Plaintiff was denied "her

right to take up to twelve weeks of leave under the FMLA")).

Upon Plaintiff's return to work, McLlwain issued her "a notice of a seven-day suspension for not performing work while she was on FMLA" leave.  (*Id.* ¶ 15).  Plaintiff challenged the suspension, which was subsequently reversed and rescinded because Plaintiff "was on leave when the infraction occurred."  (*Id.*).

F.  McLlwain Allegedly Issues Plaintiff A Sham FY 2011 Performance
    Evaluation, Leading To Her Dismissal From Her MDO Position

Plaintiff alleges that JCTM's standard protocol for year-end evaluations is as follows: (i) a supervisor invites a subordinate to complete an electronic self-evaluation; (ii) the supervisor then enters his or her own remarks into the evaluation; and (iii) the supervisor and the subordinate then have a one-on-one discussion, during which the subordinate is provided with a copy of the full evaluation, which includes the supervisor's remarks.  In October 2011, just after the close of the USPS's 2011 fiscal year ("FY 2011"), Plaintiff completed her FY 2011 self-evaluation.  As Plaintiff's supervisor, McLlwain was supposed to evaluate Plaintiff's FY 2011 performance, but McLlwain did not enter any remarks into Plaintiff's evaluation or meet with Plaintiff to discuss her evaluation.

More than one year later, in November 2012, Plaintiff received another General RIF Notice advising her that she could potentially be impacted by a re-organization.  Human resources manager Phyllis Lingenfelser told Plaintiff that she need not be concerned because she had seniority.  In December 2012, Plaintiff checked her personnel file in the Agency's Personnel Evaluating System and confirmed that she had no performance evaluation on file for FY 2011.

In January 2013, contrary to Lingenfelser's prior representations, Plaintiff received a Specific RIF Notice informing her that she would be released from her MDO position and separated from the USPS effective March 2013.  The RIF Notice also informed her that she could not be placed in another position at her current level (Level 22) because she had been

issued a "Non-Contributor" performance rating for FY 2011.  Plaintiff immediately protested

to Lingenfelser on the grounds that she had not been issued any performance evaluation for

FY 2011.  At that point, Plaintiff was presented for the first time with an FY 2011 evaluation that

included remarks from McLlwain and gave her a "Non-Contributor" rating.[5]  The thrust of

Plaintiff's allegations is that McLlwain belatedly produced a sham FY 2011 evaluation outside

JCTM's standard protocol for year-end evaluations in an attempt to cause Plaintiff to lose her

MDO position.  McLlwain indicated on the evaluation that Tour One "was not successful during

this evaluation period."  (*Id.* ¶ 18).  Despite this alleged lack of success, Wright (the other Tour

One MDO) was nevertheless issued a "Contributor" rating for that same period.

Plaintiff made several requests to stay in her MDO position, or to be placed in any

available MDO position, all to no avail.  Lingenfelser informed Plaintiff that, although

McLlwain had the power to place her in an MDO position, and had previously made placements

for other employees who had been impacted by reductions in force, McLlwain had "stated that

under no circumstances would Ms. Vick be returned to an MDO position."  (*Id.* ¶ 21).

Lingenfelser then informed Plaintiff that she had two choices:  She could either be terminated in

March 2013, or she could accept a lower-level supervisor position.  In February 2013, Plaintiff

was told that she had to make a decision, and that the only positions available to her were two

Level 17 supervisor positions at a facility in Maryland.  Shortly thereafter, Plaintiff requested to

be placed in one of the Level 17 positions.

---

[5] Plaintiff also alleges that (i) McLlwain similarly failed to meet with Watkins (the oldest of the
four MDOs) to discuss her FY 2011 performance evaluation; (ii) Watkins was likewise issued a
Specific RIF Notice in January 2013; and (iii) Watkins was also belatedly informed of her
FY 2011 "Non-Contributor" performance rating in January 2013.  Watkins was out on sick leave
when she received the RIF Notice, which was subsequently rescinded in March 2013.  Watkins
remained on sick leave until August 2013, when she retired.

G.  McLlwain Allegedly Begins Harassing Plaintiff At Her New Lower-Level
    Supervisor Position, Eventually Precipitating Plaintiff's Retirement

Plaintiff subsequently began working at the Maryland facility, where McLlwain also

served as Plant Manager.  Plaintiff again attempted to obtain her old MDO position, which

remained vacant, but McLlwain allegedly stated that she would not consider Plaintiff for any

MDO positions.  McLlwain also allegedly

> began a practice of showing up each evening on Ms. Vick's jobsite, harassing,
> threatening, and subjecting her to a hostile work environment about work
> assignments and supervising employees.  The harassment became so severe that
> Ms. Vick became emotionally distraught and was forced to retire from the [USPS].

(*Id.* ¶ 25).

H.  Plaintiff's March 2013 EEO Complaint

Plaintiff filed the EEO Complaint at issue in this case on March 2, 2013.  The EEO

Complaint references the events of 2009, when Plaintiff alleges that McLlwain first tried to

orchestrate her termination, and states that "[t]he crux of this issue continues to apply here

today."  (ECF No. 5-3 at 24).  The EEO Complaint also alleges that McLlwain began harassing

and attacking Plaintiff after the 2009 incident was resolved in Plaintiff's favor, including by

issuing numerous frivolous disciplinary charges, all of which were overturned.  The EEO

Complaint further states that McLlwain's "last action" in her campaign against Plaintiff was to

belatedly give her a "Non-Contributor" rating for FY 2011, which Plaintiff only learned about in

January 2013, when she learned that she would be released from her MDO position as a result of

the rating.  (*Id.* at 24-25).

I.  Plaintiff's Claims In This Action

Plaintiff bases all four of her claims on McLlwain (i) giving her a "Non-Contributor"

rating for FY 2011; (ii) removing her from her MDO position at JCTM; (iii) refusing to place her

in any available MDO positions after her removal; and (iv) harassing her and causing a hostile

work environment and her constructive discharge.  (*See* Compl. ¶¶ 30, 36, 41, 48).  In her

retaliation claim, Plaintiff asserts that this conduct was in retaliation for the fact that "she filed

complaints of discrimination and successfully challenged a seven-day suspension in 2012."  (*Id.*

¶ 36).  In her sex discrimination claim, Plaintiff asserts that she was treated differently from male

MDOs (*i.e.*, Stanard).  (*See id.* ¶ 30).  In her age discrimination claim, Plaintiff asserts that she

was treated differently from younger MDOs (*i.e.*, Wright and Stanard).  (*See id.* ¶ 41).  In her

FMLA claim, Plaintiff asserts that her FMLA rights were violated by the denial of "her right to

take up to twelve weeks of leave under the FMLA . . . to care for her mother in 2012," and by

McLlwain issuing her a seven-day suspension for not performing work while on FMLA leave.

(*Id.* ¶ 48).

## II.    LEGAL STANDARD

### A.    Motion To Dismiss Under Rule 12(b)(6)

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint."  *Browning v. Clinton*,

292 F.3d 235, 242 (D.C. Cir. 2002).  In considering a motion to dismiss for failure to state a

claim under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the

plaintiffs, *see id.*, and "must assume the truth of all well-pleaded allegations."  *Warren v. D.C.*,

353 F.3d 36, 39 (D.C. Cir. 2004).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation

omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

Although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote

and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above

the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal

quotation marks and citation omitted).  Moreover, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

     B.  <u>Summary Judgement</u>

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We

view the evidence in the light most favorable to the nonmoving party and draw all inferences in

its favor."). The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials, and must be supported by affidavits, declarations or other

competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See*

Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The non-movant

"is required to provide evidence that would permit a reasonable jury to find [in his favor]."

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

### III.   ANALYSIS

A.   Plaintiff's Request For Discovery Pursuant To Federal Rule Of Civil Procedure 56(d)
     And Defendant's Motion, In The Alternative, For Summary Judgment

Plaintiff argues that summary judgment is not appropriate at this stage of the case

because the parties have not engaged in discovery, and because the discovery period at the

EEOC was inadequate:

> Ms. Vick has not had an opportunity to conduct discovery at the district court level
> and was denied the chance to discover information essential to her opposition
> before the EEOC. Prior to obtaining legal representation, Ms. Vick submitted
> requests for the production of documents to [Defendant], but [Defendant] refused
> to respond to her requests, and she did not obtain any of the requested information,
> which is essential to her claims.

(Opp'n at 41). Plaintiff also lists nine specific discovery requests that she intends to propound

on Defendant, and explains why the documents and information sought in these requests are

essential to her claims. (*See id.* at 41-42). Plaintiff also provides a declaration to the same effect

(*see id.* Ex. I),[6] and asserts that she would be severely prejudiced by the issuance of summary

---

[6] Plaintiff's declaration states that it is made pursuant to Federal Rule of Civil Procedure 56(f).
(*See* Opp'n Ex. I). Plaintiff's Opposition makes reference to Rule 56(f), as well. (*See* Opp'n at
40-41). The former Rule 56(f) became Rule 56(d) in the 2010 Amendments to the Federal Rules
of Civil Procedure, however. *See* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (d)

judgment before discovery.  (*Id.* at 42-43).  Surprisingly, Defendant does not address this argument at all in its Reply.

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may, (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  In light of Plaintiff's averments regarding the discovery that she needs to effectively prosecute her case and Defendant's silence in response to those averments, and because summary judgment is premature unless all parties have "had a full opportunity to conduct discovery," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986), the court hereby **DENIES** Defendant's Motion insofar as it seeks summary judgment.

The parties are hereby **ORDERED** to meet and confer, and to file a proposed discovery schedule (accompanied by a proposed scheduling order) by no later than **May 2, 2016**.

B.  Defendant's Motion To Dismiss For Failure To State A Claim

While it is somewhat difficult to parse Defendant's 12(b)(6)-specific arguments from its summary judgment arguments, Defendant explicitly contends that "Plaintiff has not shown one claim based on facial plausibility from which there could be drawn a reasonable inference that [it] was liable for any alleged misconduct."  (Mot. at 4).  The court will address this argument, as well as Defendant's exhaustion of administrative remedies argument (*see id.* at 6-12), and its FMLA statute of limitations argument (*see id.* at 12-17), under the Rule 12(b)(6) framework.

---

carries forward without substantial change the provisions of former subdivision (f).").  As such, the court will treat Plaintiff's references to Rule 56(f) as if they refer to Rule 56(d).

1.   Exhaustion Of Administrative Remedies

The EEOC has promulgated detailed regulations establishing administrative procedures for the resolution of employment discrimination claims against federal agencies.  A Title VII plaintiff must timely exhaust these administrative procedures before filing suit in federal court, although the limits are not jurisdictional and "are subject to equitable tolling, estoppel, and waiver." *Bowden v. U.S.*, 106 F.3d 433, 437 (D.C. Cir. 1997).  The D.C. Circuit has summarized the procedures applicable to Title VII claims as follows:

> Under Title VII, employees who believe they have been discriminated against must first consult an Equal Employment Opportunity (EEO) Counselor within 45 days of the alleged discriminatory acts.  Should the employee and the Counselor fail to resolve the discrimination claim within 30 days, the Counselor sends the employee a notice explaining the administrative complaint procedure.  The employee then has 15 days to file an individual and/or class complaint with the employing agency.  Upon receipt of a final agency decision – known as a "FAD" – disposing of the administrative complaints, the employee has either 30 days to appeal to the Equal Employment Opportunity Commission (EEOC), or 90 days to file suit in federal court.

*In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006) (citations omitted).  "Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).

Defendant argues that because Plaintiff first contacted an EEO counselor on January 10, 2013, any "discrete act" alleged in the Complaint is time-barred if it occurred more than 45 days prior to that date – *i.e.*, before November 26, 2012.  (Mot. at 8).  Thus, Defendant argues, Plaintiff's allegations regarding the following are not actionable here:

> i.    the 2009 RIF, McLlwain's subsequent denial of Plaintiff's applications for various MDO positions, and McLlwain's related attacks, harassment and threats, all of which precipitated Plaintiff's first FMLA leave;

    ii.    McLlwain's 2010 attempt to reduce the number of MDOs at JCTM from four to three, and her provision of interview questions and answers to two other MDOs, but not to Plaintiff;

    iii.   McLlwain's 2011 "barrage of attacks" precipitating Plaintiff's second FMLA leave;

    iv.   McLlwain belatedly giving Plaintiff a sham "Non-Contributor" rating for FY 2011 without the required notification; and

    v.    Plaintiff's early 2012 suspension related to her third FMLA leave.

(*See id.* at 9-10). Defendant characterizes all of these allegations as pertaining to discrete acts of discrimination and/or retaliation which are insufficient to make out a claim for hostile work environment. Defendant also asserts that Plaintiff has waived her claim that she was constructively discharged because she did not raise it in her initial EEO Complaint. (*See id.* at 10-11).

Plaintiff contends that all of her pre-November 26, 2012 allegations are timely because they do not constitute discrete acts, and are instead components of her Title VII and ADEA hostile work environment claims. (*See* Opp'n at 18-20). Plaintiff also argues that she did not waive her constructive discharge claims because they arise out of her hostile work environment claims, and because her EEO Complaint put Defendant on notice of the fact that she would assert constructive discharge. (*See id.* at 21-23).

The D.C. Circuit has held that suits following an EEO complaint are "limited in scope to claims that are 'like or reasonably related to the allegations'" of an EEO complaint, or that "'grow[] out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). At a minimum, such claims "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (quoting *Chisholm v. Postal Service*, 665 F.2d 482, 491 (4th Cir.

1981)).  A plaintiff need not use any talismanic language in an EEO complaint, nor must

she use the specific term "hostile work environment," in order to properly exhaust such a

claim.  *See Johnson-Parks v. D.C. Chartered Health Plan*, 806 F. Supp. 2d 267, 270

(D.D.C. 2011) (quoting *Maryland v. Sodexho, Inc.*, 474 F. Supp. 2d 160, 162 (D.D.C.

2007) ("[T]he law does not hold an employee to the use of magic words to make out a

proper discrimination charge.")); *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C. 2008)

(a "plaintiff need not specifically allege a hostile work environment claim" at the

administrative level).

As to timeliness, the Supreme Court has made clear that "discrete discriminatory

acts are not actionable if time barred, even when they are related to acts alleged in timely

filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  But

the Court has also found that hostile work environment claims "are different in kind from

discrete acts" because "[t]heir very nature involves repeated conduct."  *Id.* at 115.

A hostile work environment claim, the Court said, "is composed of a series of separate

acts that collectively constitute one unlawful employment practice."  *Id.* at 117 (quotation

omitted).  The D.C. Circuit has since held that "hostile work environment claims are

subject to a different limitations rule," which is that so long as "an act contributing to the

claim occurs within the filing period, the entire time period of the hostile environment

may be considered by a court for the purposes of determining liability."  *Singletary v.

D.C.*, 351 F.3d 519, 526-27 (D.C. Cir. 2003).

The D.C. Circuit has cautioned that the Supreme Court's holding in *Morgan*

"is not, however, an open sesame to recovery for time-barred violations.  Both incidents

barred by the statute of limitations and ones not barred can qualify as 'part of the same

actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim – if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting *Morgan*, 536 U.S. at 120-21); *see also Morgan*, 536 U.S. at 118 (excluding any incident that "had no relation to the [other] acts . . . or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim").

Viewing the facts alleged in the Complaint in the light most favorable to Plaintiff, the court finds that Plaintiff's Title VII and ADEA hostile work environment claims are reasonably related to and grow out of the allegations in Plaintiff's EEO Complaint, in that they arise from the administrative investigation that one would reasonably expect to have followed the filing of Plaintiff's EEO Complaint.  Specifically, Plaintiff alleges in her EEO Complaint that (i) McLlwain first discriminated against her in 2009; (ii) "[t]he crux of [the 2009] issue continues to apply here today"; (iii) McLlwain began harassing and attacking her shortly after the 2009 issue was resolved in Plaintiff's favor, including by issuing numerous frivolous disciplinary charges; and (iv) McLlwain's "last action" in her campaign against Plaintiff was to give her a "Non-Contributor" rating for FY 2011, which Plaintiff only learned about in January 2013, when she learned that she would be released from her MDO position as a direct result of that rating.  (ECF No. 5-3 at 24-25). The EEO Complaint therefore put Defendant on notice of Plaintiff's claim that McLlwain had engaged in a years-long campaign to orchestrate her termination by subjecting her to a hostile work environment.

Along the same lines, the court finds that Plaintiff's EEO Complaint sufficed to put Defendant on notice of her claim of constructive discharge, as that claim also reasonably relates to and grows out of the allegations set forth in the EEO Complaint. As noted above, Plaintiff's EEO Complaint put Defendant on notice of her hostile work environment claim, and Plaintiff explicitly alleges that this hostile work environment "led to her constructive discharge." (Compl. ¶¶ 30, 36, 41, 48). Thus, the constructive discharge claim also arises from the administrative investigation that can reasonably be expected to have followed the charge of discrimination set forth in Plaintiff's EEO Complaint.

The court also finds that Plaintiff has adequately linked her pre-November 26, 2012 allegations, which Defendant claims are untimely, to her post-November 26, 2012 allegations, the timeliness of which Defendant concedes. Plaintiff essentially alleges that McLlwain engaged in a single multi-year campaign to harass her and remove her from her job, and that this campaign consisted of relatively frequent flare-ups of hostile conduct. While the conduct at issue here took place over a number of years, it nevertheless amounts to a "coherent hostile environment claim . . . involv[ing] the same type of employment actions, occurr[ing] relatively frequently, and [being] perpetrated by the same manager[]." *Baird,* 662 F.3d at 1251; *see also Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years.") (citation omitted).

Per the foregoing, the court finds that Plaintiff has exhausted her administrative remedies with regard to the Complaint's pre-November 26, 2012 allegations, as well as with regard to Plaintiff's allegations of constructive discharge, and that all of her hostile work environment-related allegations are timely.

2.   The Timeliness Of Plaintiff's FMLA Claim

A plaintiff must bring an FMLA claim within two years of "the last event constituting the alleged violation" of the statute.  29 U.S.C. § 2617(c)(1).  A three-year statute of limitations applies, however, if "the complaint contains some express or implied allegation of willful conduct."  *Hodge v. United Airlines*, 666 F. Supp. 2d 14, 23 (D.D.C. 2009) (citing *Sampson v. Citibank, F.S.B.*, 53 F. Supp. 2d 13, 19 (D.D.C. 1999)); *see also* 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought.").  "In the context of the FMLA, willful conduct is generally viewed as 'an employer that knows its conduct to be wrong or has shown reckless disregard for the matter in light of the statute.'"  *Hodge*, 666 F. Supp. 2d at 23 (quoting *Sampson*, 53 F. Supp. 2d at 19; citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) (adopting "knowing or reckless disregard" standard in the analogous Fair Labor Standards Act context); *Bass v. Potter*, 522 F.3d 1098, 1103-04 (10th Cir. 2008) (following decisions of the First, Second, Sixth and Eighth Circuits in applying the *McLaughlin* standard to the FMLA)).

Defendant asserts that the Complaint does not contain any express or implied allegation of willful FMLA violations.  (*See* Mot. at 15).  Plaintiff contends, however, that she has alleged willful violations by claiming that "McLlwain knowingly denied her request to take FMLA leave to care for her mother who had Stage IV lung cancer without justification and intentionally

18

issued her a seven day suspension in 2012 for not performing work while on FMLA" leave. (Opp'n at 24) (citing Compl. ¶¶ 15, 48).

Construing the Complaint in the light most favorable to Plaintiff, and considering her claim that McLlwain acted "knowingly" and "intentionally," the overall arc of Plaintiff's allegations regarding McLlwain's multi-year campaign to orchestrate her termination through attacks, threats, harassment and baseless disciplinary actions, including the suspension that is alleged to have interfered with Plaintiff's FMLA rights, is sufficient to state a willful violation. *See*, *e.g.*, Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Moreover, as noted above, the court construes the Complaint to allege that Plaintiff was eligible for additional FMLA leave when McLlwain ordered her to return to work. (*See* Compl. ¶ 48 (alleging that Plaintiff was denied "her right to take up to twelve weeks of leave under the FMLA")).  Plaintiff's eligibility for this additional FMLA leave, which should have been obvious to McLlwain given that she had apparently already granted Plaintiff FMLA leave to be with her ailing mother, supports an implied allegation that McLlwain's denial of her request was willful.

At this early stage of the case, the foregoing is sufficient to allege willfulness.  *See Ricco v. Potter*, 377 F.3d 599, 603 (6th Cir. 2004) ("Because a plaintiff's factual allegations must be taken as true for purposes of a Rule 12(b)(6) motion, a plaintiff may survive merely by having alleged that the FMLA violation was willful.").  Accordingly, the court finds that Plaintiff's FMLA claim is not time-barred.

### 3.   The Sufficiency Of Plaintiff's Allegations

As noted above, Defendant contends that "Plaintiff has not shown one claim based on facial plausibility from which there could be drawn a reasonable inference that [it] was liable for

any alleged misconduct." (Mot. at 4). For the reasons set forth below, the court disagrees, and

concludes that the Complaint has adequately stated claims for sex discrimination and retaliation

under Title VII, age discrimination under the ADEA, and the violation of Plaintiff's rights under

the FMLA.

a.  Plaintiff's Title VII And ADEA Claims (Counts I, II and III)

Plaintiff alleges that she was subjected to a hostile work environment because of her sex

and age, and in retaliation for filing an EEO complaint in 2009, in violation of Title VII and the

ADEA. "Courts apply the same analysis when evaluating a hostile work environment claim

under Title VII and the ADEA." *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 82 (D.D.C. 2015) (citing

*Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 162 n.9 (D.D.C. 2014)). To establish a hostile

work environment claim, a plaintiff must offer evidence that "the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A plaintiff alleging hostile work environment must

demonstrate: that (i) she is a member of a protected class; (ii) she was subjected to unwelcome

harassment; (iii) the harassment occurred because of the plaintiff's protected status; (iv) the

harassment affected a term, condition or privilege of employment; and (v) the employer knew or

should have known of the harassment in question but nonetheless failed to either take steps to

prevent it or afford the plaintiff prompt remedial action. *See*, *e.g.*, *Baloch v. Norton*, 355 F.

Supp. 2d 246, 259 (D.D.C. 2005); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120 (D.D.C.

2004).

In determining whether a hostile work environment exists, the Supreme Court has

directed courts to look at the totality of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  The standards for judging hostile work environment claims are sufficiently demanding to ensure that the federal non-discrimination statutes do not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).

Moreover, a "plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . because of' the employee's protected status." *Peters v. District of Columbia,* 873 F. Supp. 2d 158, 188-89 (D.D.C. 2012) (quoting *Oncale*, 523 U.S. at 81).  "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack linkage of correlation to the claimed ground of discrimination." *Id.* (quoting *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009)).  As discussed above with regard to Defendant's exhaustion of administrative remedies argument, in order for allegations to qualify as "part of the same actionable hostile work environment claim," they must be "adequately linked into a coherent hostile environment claim" in that they must have "involve[d] the same type of employment actions, occur[red] relatively frequently, and [been] perpetrated by the same managers." *Baird,* 662 F.3d at 1251.

The court finds that Plaintiff has adequately alleged that she was subjected to a hostile work environment in violation of Title VII and the ADEA.  She alleges that McLlwain attacked, harassed and threatened her on a daily basis in 2009, causing her so much stress that she needed to take FMLA leave, and that this kind of conduct continued on a fairly regular basis throughout the remainder of her employment, causing her to take FMLA leave again in 2011 and leaving her so "emotionally distraught" that she was "forced to retire" in 2013.  (Compl. ¶ 25).  Plaintiff's

allegations regarding some of the more nefarious means by which McLlwain attempted to orchestrate her termination also help state a claim for hostile work environment.  For example, Plaintiff alleges that McLlwain required all four MDOs to interview with her in order to keep their jobs in 2010, and provided the questions and answers – a veritable interview "cheat sheet" – in advance to two other MDOs, but not to Plaintiff.  Plaintiff also alleges that, in 2013, McLlwain belatedly included in Plaintiff's personnel file a sham FY 2011 performance evaluation.  These allegations are not mere grievances about McLlwain's "management style" (Mot. at 29); rather, they paint a picture of a manager repeatedly attempting, over a long period of time and through a variety of different and sometimes dishonest means, to force Plaintiff from her job.  In the court's view, such severe and unfair conduct could be found to "unreasonably interfere[] with an employee's work performance." *Harris*, 510 U.S. at 23.

The court also finds that Plaintiff has adequately linked her allegations regarding McLlwain's years-long harassment of her to McLlwain's attempts to orchestrate her termination. As noted above in the court's discussion of Defendant's exhaustion argument, Plaintiff alleges that McLlwain engaged in a longstanding campaign to unjustly deprive Plaintiff of her job, and that this campaign consisted of relatively frequent flare-ups of hostile conduct.  Plaintiff's allegations amount to a "coherent hostile environment claim . . . involv[ing] the same type of employment actions, occurr[ing] relatively frequently, and [being] perpetrated by the same manager[]." *Baird,* 662 F.3d at 1251; *see also Morgan*, 536 U.S. at 115 (noting that hostile environment claims involve "repeated conduct" that can occur "over a series of days or perhaps years") (citation omitted).

Plaintiff's allegations are also sufficient, at this stage, to make out a claim that she was subjected to this hostile work environment because of her protected status.  As to her Title VII

claim for sex discrimination, Plaintiff alleges she was treated differently from Stanard, the male

MDO on Tour Two.  Among other things, Plaintiff alleges that when McLlwain attempted in

2010 to reduce the number of MDOs at JCTM by conducting interviews with all four MDOs, she

provided the interview questions and answers to Stanard but not to Plaintiff.  An inference that

may be drawn from this allegation is that Stanard was provided with this interview "cheat sheet"

because he is a man, and that Plaintiff was not provided with it because she is a woman.

As to her ADEA claim, Plaintiff also alleges that both Wright and Stanard, the two

younger MDOs, were treated differently.  Among other things, Plaintiff alleges that Wright was

given the interview "cheat sheet" along with Stanard, and that Plaintiff was not.  An inference

that may be drawn from this allegation is that the younger MDOs were given the interview

questions and answers, while the two older MDOs (Plaintiff and Watkins) were not, because of

their respective ages.  Plaintiff also alleges that she was given a "Non-Contributor" rating for

FY 2011 because Tour One "was not successful during [that] evaluation period" (Compl. ¶ 18),

but that Wright – who was the junior MDO on Tour One and who "occupied the same position,

shared the same duties and managed the same personnel" as Plaintiff – received a "Contributor"

rating for that period (*id.* ¶ 7).  The inference to be drawn from this allegation is that, if Tour One

was unsuccessful in FY 2011, Plaintiff and the younger Wright would have *both* received

"Non-Contributor" ratings, and that Plaintiff was given a "Non-Contributor" rating not because

Tour One was actually unsuccessful, but rather because of her age.

In order to state a claim for retaliation, Plaintiff must allege that she "engaged in a

statutorily protected activity, that [her] employer took an adverse personnel action against [her],

and that a causal connection exists between the two."  *Jones v. D.C. Water & Sewer Auth.*, 922

F. Supp. 2d 37, 41 (D.D.C. 2013) (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir.

1998).  Statutorily protected activities include "opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment."  *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212 (D.D.C. 2006) (citation omitted).  A plaintiff "must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation."  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91-92 (D.D.C. 2006).

Here, Plaintiff sufficiently alleges retaliation in violation of Title VII.  Specifically, she alleges that she engaged in statutorily protected activity by filing a discrimination complaint in 2009, and that after that complaint was resolved and she was returned to her MDO position, McLlwain "began a barrage of personal attacks against [her] in an effort to retaliate to cause her termination from employment."  (Compl. ¶¶ 9-10).  Plaintiff also alleges that this barrage of attacks continued through the remainder of her employment with the USPS, and included numerous adverse personnel actions, including her removal from her position in 2013.  As discussed above, the manner in which Plaintiff links all of the conduct of which she complains suffices to make out a claim for retaliation-based hostile work environment.

b.  Plaintiff's FMLA Claim (Count IV)

"An employer may be held liable for violating the FMLA under two distinct claims: (1) interference, if the employer restrained, denied, or interfered with the employee's FMLA rights, and (2) retaliation, if the employer took adverse action against the employee because the employee took leave or otherwise engaged in activity protected by the Act."  *Holloway v. D.C. Gov't*, 9 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 64 (D.D.C. 2011); *Price v. Washington Hosp. Ctr.*, 321 F. Supp. 2d 38, 45-46 (D.D.C. 2004)).  The Complaint here alleges facts sufficient to state claims for both interference and retaliation in violation of the FMLA.

As an initial matter, Plaintiff's mother's illness is alleged to constitute an FMLA qualifying event, as Plaintiff was, in fact, granted FMLA leave to be with her mother in March 2012.  As noted above, while it is unclear precisely how long Plaintiff was on FMLA leave before McLlwain denied her request for further FMLA leave and ordered her to return to work, the court construes Plaintiff's allegations as meaning that she was still eligible for more FMLA leave at the time that she was ordered to return to work.  Accordingly, these allegations suffice to state a claim for interference in violation of the FMLA.

As to Plaintiff's FMLA retaliation claim, the specifics of her post-FMLA leave suspension will be essential to determining whether that suspension constituted an adverse action.  *See*, *e.g.*, *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) (collecting cases indicating that the question of whether a suspension constitutes an adverse employment action depends on a number of considerations, including whether the suspension was with or without pay).  The details of Plaintiff's alleged suspension are not spelled out in any great detail in the Complaint, and the court will not go beyond the Complaint other than to review Plaintiff's EEO Complaint, which also does not provide much detail regarding the alleged suspension.  However, such detail is not required to survive dismissal at this early stage of the case.  In construing the allegations of the Complaint in the light most favorable to Plaintiff, the court will infer that the suspension constituted an adverse employment action, and therefore finds that the Complaint suffices to state a facially plausible claim for retaliation in violation of the FMLA.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion is hereby **DENIED.**  An appropriate Order accompanies this Memorandum Opinion.

Date:  March 28, 2016

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge