**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **ELLA D. VICK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-2193 (TSC) |
| | ) | |
| **DAVID STEINER,** *Postmaster General,* | ) | |
| *U.S. Postal Service,* | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION SETTING FORTH
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Ella Vick sued the Postmaster General of the United States Postal Service, alleging that she was discriminated against because of her gender and age and retaliated against because of prior protected activity, in violation of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). She further alleged that she was subjected to a hostile work environment and constructively discharged from her employment, also in violation of Title VII and the ADEA. She also claimed that the Postal Service interfered with her use of Family Medical Leave and retaliated against her for use of Family Medical Leave in violation of the Family Medical Leave Act ("FMLA").

The court held a six-day trial in August 2022, with a jury hearing Plaintiff's Title VII claims and the court hearing Plaintiff's ADEA and FMLA claims. The jury returned a verdict in favor of Defendant on each of Plaintiff's Title VII claims, and Plaintiff submitted her ADEA and FMLA claims to the court.

The court has reviewed the parties' submissions, carefully considered the testimony and evidence presented at trial, weighed the credibility of witnesses, and applied the applicable law.

Based on the findings of fact and conclusions of law set forth herein, the court concludes that Plaintiff has not met her burden of proof on her ADEA or FMLA claims, and that judgment must therefore be entered in favor of Defendant.

## I.    FINDINGS OF FACT

1.    Plaintiff was born in 1956 and was over the age of 40 during the period between 2009 and 2013.  Trial Tr. at 193:17–18, ECF No. 86.

2.    Rosetta Watkins was born in 1943 and was over the age of 40 during the period between 2009 and 2013.  *Id.* at 378:11–19, ECF No. 88.

3.    Watkins is 13 years older than Plaintiff.  *Id.* at 193:17–18; 378:11–19.

4.    Sherrod Stanard was born in 1966 and was over the age of 40 during the period between 2009 and 2013.  *Id.* at 714:3–6, ECF No. 91.

5.    Lonzine Wright was born in 1968 and was over the age of 40 during the period between 2009 and 2013.  *Id.* at 766:1–4.

6.    Plaintiff, Stanard, Watkins, and Wright were Managers of Distribution Operations ("MDO") at the U.S. Postal Service's Joseph Curseen, Jr. and Thomas Morris, Jr. Processing and Distribution Center in Washington, D.C. (also known as "Curseen Morris" or "JCTM").  *Id.* at 200:10–12, 206:1–2; 377:23–378:25; 600:2–5, ECF No. 90; 749:17–22.

7.    Dr. Wendy McLlwain was born in 1962 and was over the age of 40 during the period between 2009 and 2013.  *Id.* at 986:25–987:1, ECF No. 93.

8.    McLlwain is only six years younger than Plaintiff.  *Id.* at 193:17–18; 986:25–987:1.

9.    Phyllis Lingenfelser worked for the Postal Service for a total of 43 years before her retirement in 2019 and was therefore over the age of 40 during the period between

2009 and 2013. *Id.* at 485:19–487:4, ECF No. 89. Although the year of Lingenfelser's birth is not in the trial record, the court may take judicial notice of the fact that since the 1930s, federal child labor laws have generally prohibited the employment of minors in nonagricultural occupations under the age of 14. *See generally* 29 U.S.C. § 203; 29 C.F.R. pt. 570. The court may therefore reasonably infer based on Lingenfelser's years of employment that she was over the age of 40 during the period of 2012 to 2013, because even if she was only 15 years old when she began her employment with the Postal Service in 1976, she would still have been at least 51 by 2012.

10. Edgar "Nat" Gramblin has worked for the Postal Service since 1986 and was employed before his Postal Service career as a clerk for the Department of Justice. Trial Tr. at 419:1–424:22.

11. Gramblin was therefore over the age of 40 during the period relevant to the 2012/2013 Reduction in Force. Again, although the year of Gramblin's birth is not in the trial record, the court may reasonably infer based on Gramblin's years of employment that he was over the age of 40 during the period of 2012 to 2013, because even if he was only 15 years old when he began his employment with the Postal Service in 1986, he would still have been at least 41 by 2012.

12. All U.S. Postal Service managers accused in this case of acts of age-related discrimination or contributing to a discriminatory (age-based) hostile work environment—McLlwain, Lingenfelser, and Gramblin—were over the age of 40 during the period relevant to their alleged discriminatory actions. *Id.* at 986:25–987:1; 485:19–487:4; 419:1–424:22.

13. McLlwain became Plaintiff's supervisor in late 2008 or early 2009 when McLlwain was promoted to Plant Manager at Curseen Morris. *Id.* at 243:21–25, ECF No. 87.

14. Plant Managers other than McLlwain had been critical of Plaintiff's work performance. *Id.* at 322:8–334:18.

15. In October 2009, then-Plant Manager Edward "Vince" Jackson issued Plaintiff an official disciplinary letter of warning for unacceptable work performance because the delivery unit for zip code 20001 had received 30 feet of unworked first-class mail that a tracking report revealed could have and should have been processed, and which resulted in additional processing and expense for both the Curseen Morris Plant and the delivery unit. Def. Ex. 13; Trial Tr. at 323:2–325:18.

16. Jackson also sent Plaintiff a letter of concern in June 2010 regarding Plaintiff's scanning scores—which were critical to the mission of the Postal Service and a requirement of Plaintiff's MDO position—which he wrote demonstrated complacency. Trial. Tr. at 326:1–329:19.

17. Senior Plant Manager Theresa Gibbs also upheld a Letter of Warning in lieu of a seven-day Time Off Suspension against Plaintiff in March 2009 for a "serious and unacceptable" offense; in doing so Gibbs found that Plaintiff's comments on the matter were not altogether truthful, and that Plaintiff failed to follow directions that Gibbs gave her. Def. Ex. 19; Trial Tr. at 329:20–334:18.

18. Plaintiff's colleagues were also critical of her work performance, including Stanard, who, when working on the customer service side of Curseen Morris, observed that he received a lot of "unworked mail" that was not properly processed by Plaintiff when she was the MDO for Tour 1. Trial Tr. at 620:8–621:8. Despite Stanard's

conversations with Plaintiff about that issue, Plaintiff did not address it. *Id.* at 621:19–622:2.

19. No witness other than Plaintiff testified that she performed her job well, *see generally* Trial Tr.; former Plant Manager Gramblin testified that Plaintiff "wasn't bad" at her job, *id*. at 461:10–14, but that she struggled to hold her subordinates accountable, *id.* at 434:12–436:11.

20. McLlwain was also disappointed in Plaintiff's performance as an MDO and conveyed to Plaintiff that she needed to follow appropriate steps to hold her subordinate employees accountable for poor work performance or attendance issues. *Id.* at 805:20–810:20.

21. A reduction in force ("RIF") in 2009 impacted the MDO position at Curseen Morris; at the time, McLlwain was the Curseen Morris Plant Manager, and there were four MDOs, including Plaintiff. *Id.* at 838:15–839:10, ECF No. 92.

22. The 2009 RIF was partially intended to reduce the MDO positions from four to three. *Id.* at 839:7–10.

23. Blanca Sanchez, who was the HR manager at the time, initially advised McLlwain that she needed to interview the four MDOs for the three remaining positions. *Id.* at 839:11–17.

24. McLlwain conducted interviews and—had the choice been up to her—would not have selected Plaintiff for one of the remaining positions based on her experience with Plaintiff's performance, Tour 1's struggles under Plaintiff's leadership, her observations of Plaintiff on the floor, and relevant data points relating to mail-

processing efficiency; she would have instead kept Stanard, Wright, and Watkins (who is 13 years older than Plaintiff).  *Id.* at 839:18–845:23.

25.  McLlwain, however, was not the ultimate decisionmaker, *id.* at 846:5–7; rather, the Senior Plant Manager, along with HR and customer services, made the decision to keep Plaintiff, Watkins, and Stanard in their MDO positions and to remove Wright (the youngest of the four MDOs) from the MDO position and assign her to customer service, *id.* at 847:1–4, 848:14–25.

26.  McLlwain did not object to Plaintiff remaining in her MDO position after the 2009 RIF.  *Id.* at 848:17–20.

27.  The Plant Manager at Curseen Morris held daily "Turnover Meetings" with the Tour 1 and Tour 2 MDOs, as well as other plant supervisors and representatives of the other DC-area plants.  *Id.* at 622:15–623:6; 754:12–755:2.

28.  Turnover Meetings were an opportunity to discuss daily issues that began during Tour 1 that would need to be addressed in the next shift, as well as broader issues at the plant.  *Id.* at 623:1–6, 754:12–755:2.

29.  During Turnover Meetings, McLlwain gave feedback to all attendees in an effort to hold them accountable.  *Id.* at 622:15–623:6, 627:7–632:3, 680:1–5; 754:9–755:2, 756:6–758:25.

30.   McLlwain sometimes offered feedback using an aggressive tone, but she did not yell at employees.  *Id.* at 444:2–4; 628:6–7; 756:19–757:1, 758:16–25.

31.  Plaintiff received a "Non-Contributor" rating on her Fiscal Year ("FY") 2011 performance evaluation.  Joint Ex. 14.

32. Plaintiff's "Non-Contributor" performance evaluation was completed by McLlwain in November 2011 and delivered to Plaintiff via automated emails from the Performance Evaluation System ("PES") marked as "high importance" in 2011. *Id.*; Def. Exs. 15, 16.

33. Plaintiff had access to her FY 2011 Performance Evaluation in the PES system and could have accessed it and reviewed it by clicking on the hyperlink in her emails anytime from November 2011 and for the next four years. Trial Tr. at 727:21–735:24.

34. The PES system date stamps reviewer comments in performance evaluations, and these date stamps cannot be modified or altered after the fact because the system locks once the reviewer enters their comments. *Id.* at 723:19–23, 735:25–736:13.

35. Plaintiff also would have been aware that she received a "Non-Contributor" rating because higher ratings, which Plaintiff received in prior years, came with pay increases, whereas Non-Contributor ratings came with no pay increase. *Id.* at 334:21–341:2; 541:3–12; Def. Ex. 19 at 3, 4; Joint Ex. 1 at 30–31.

36. McLlwain also testified credibly that she spoke with Plaintiff over the phone on the morning of November 2, 2011, to deliver Plaintiff's FY 2011 performance evaluation to her orally. Trial Tr. at 871:2–872:16. McLlwain's testimony on this point was more credible than Plaintiff's testimony that no such phone call occurred because McLlwain's testimony is corroborated by the contemporaneous notation she made in the PES system that a conversation was held on November 1, 2011 (the day Plaintiff's overnight shift began), Joint Ex. 14, and because her memory of the conversation she had with Plaintiff was detailed and clear. The court finds Plaintiff's

testimony that no such conversation occurred to be less credible because her testimony and theory that McLlwain invented this evaluation in 2012 in order to have her removed during the RIF was directly contradicted by PES emails that were sent to her official email address in 2011.  Def. Exs. 15, 16.

37. Defendant's Time and Attendance Control System ("TACS") confirms that Plaintiff's shift started at 11:00 p.m. on November 1, 2011.  Pl. Ex. 1N.

38. At the time McLlwain gave Plaintiff a "Non-Contributor" rating in November 2011, she did not know that there would be a RIF announced almost a year later, or that the rating would lead to Plaintiff having a less advantageous position in the 2012/2013 RIF.  Trial Tr. at 1017:20–23.

39. McLlwain rated Plaintiff as a "Non-Contributor" for FY 2011 based on metrics, machine productivity data, and her own observations of Plaintiff's shortcomings working on the floor and communicating with her subordinates as a Tour 1 MDO.  *Id.* at 854:7–875:6; Joint Ex. 14.

40. Stanard, one of the other MDOs at Curseen Morris in 2011, was given an overall rating for FY 2011 of "Contributor," which was substantiated by the work he did, including increasing the rate of mail clearing, reducing work hours to plan, achieving internal goals for timely preparation of mail for transportation, and training and communicating effectively with co-workers.  Joint Ex. 11; Trial Tr. at 893:13–894:15, 895:1–897:23, 898:10–906:19.

41. Wright, another MDO at JCTM who worked on Tour 1 with Plaintiff, was also given an overall rating for FY 2011 of "Contributor."  Joint Ex. 10.

42.    Wright's overall rating and the scores she received for the four metrics upon which she was rated were substantiated by the work she did.

43.    The first component on which Wright was rated was "Increase surface [visibility] scan rate."  Trial Tr. at 878:8–12; Joint Ex. 10.  For this component, Wright was evaluated on different metrics than Plaintiff because when they worked together, they supervised different parts of the Tour.  Trial Tr. 878:17–881:5.  Wright received a 4 ("Contributor") out of 15 possible points for this component, Joint Ex. 10, because, though the Tour did not meet its metrics for this component, she had a plan for improvement moving forward, Trial Tr. at 883:3–9.  Plaintiff was given a 3 for the same component because she had no plan to address the Tour's problems in the scanning area and had not shown that she could manage her employees.  *Id.* at 883:10–884:2.

44.    The second component on which Wright was rated was "Reduce overtime percent plan," for which she received a 3 ("Non-Contributor") out of a possible 15 points.  Joint Ex. 10.

45.    The third component upon which Wright was rated was "Reduce work hours percent to plan" and she received a 3 ("Non-Contributor") out of a possible 15 points.  *Id.*  Like Plaintiff, Wright received Non-Contributor ratings for the components related to managing the labor budget for Tour 1 because the Tour was unsuccessful in this area.  Trial Tr. at 884:3–887:2.

46.    McLlwain gave Wright a 4 ("Contributor") out of 15 possible points for the fourth component: oral communication, Joint Ex. 10, because she saw evidence that Wright was holding her team accountable and was making an effort to train her team on new

machines.  Trial Tr. at 888:6–890:4.  McLlwain gave Plaintiff a 3 because Wright demonstrated initiative and ability to communicate with her team, whereas Plaintiff did not.  *Id.* at 890:5–19.

47.    McLlwain recommended that Wright receive a Contributor rating for FY 2011 while recommending a Non-Contributor rating for Plaintiff because Wright's data metrics were stronger and Wright was a stronger communicator.  *Id.* at 1065:12–1066:14, ECF No. 94.

48.    Watkins, one of the other MDOs at JCTM in 2011, also received an overall rating of "Non-Contributor" for FY 2011.  Joint Ex. 17.

49.    Watkins' overall rating and the scores she received for the four metrics on which she was rated were substantiated by the work she did.  Specifically, McLlwain recommended that Watkins receive a Non-Contributor rating for FY 2011 because Tour 3 was unsuccessful, as measured by the metrics, under Watkins' leadership. Trial Tr. at 923:7–18.

50.    McLlwain's FY 2011 reviews are consistent with Gramblin's testimony that Wright was a stronger MDO than were Plaintiff and Watkins.  *Id.* at 460:15–461:1.

51.    In the fall of 2012, a RIF was announced which would impact the MDO position in March 2013.  This announcement was made during employee meetings with HR in September 2012 and in a General Notice of Reduction in Force in November 2012. Def. Ex. 26; Joint Ex. 4.

52.    HR employees at the Postal Service's headquarters office decided that Curseen Morris needed to reduce its number of MDOs from four to three and communicated

this information to Acting HR Manager for the Capital District, Phyllis Lingenfelser, in late fall/winter of 2012.  Def. Exs. 2, 25, 26; Trial Tr. at 491:15–501:5.

53. There were four MDOs at Curseen Morris who were subject to the RIF: Plaintiff, Stanard, Wright, and Watkins.  Trial Tr. at 491:15–501:5.

54. Stanard had served on active duty with the Army for approximately four months during the Gulf War in 1990 for military police training in Alabama and received an honorable discharge.  Def. Ex. 34; Trial Tr. at 610:19–616:10.

55. Postal Service HR was made aware of Stanard's military service in 1990 because Stanard submitted copies of his military orders when he needed to temporarily separate from the Postal Service to serve with the Army.  Trial Tr. at 595:14–19, 610:19–616:10.

56. Stanard was identified by HR employees in the headquarters office as eligible for a veterans' preference pursuant to Office of Personnel Management ("OPM") regulations and the Code of Federal Regulations, entitling him to preference during a RIF over non-veteran employees, including Plaintiff, Wright, and Watkins.  *See id.* at 501:6–515:07.

57. Because HR employees identified Stanard as having a veterans' preference, his position was not impacted in the RIF, and he received the first of the three remaining MDO positions.  *Id.* at 511:1–11; Joint Ex. 19 at 10, 13.

58. Wright was placed in the second of the three remaining MDO positions at Curseen Morris because she received a "Contributor rating," whereas the remaining two MDOs (Plaintiff and Watkins) had received "Non-Contributor" ratings; this was

consistent with the Postal Service's RIF policies.  Joint Ex. 19 at 19; Trial Tr. at 518:11–523:16.

59. HR employees from headquarters issued specific RIF notices to Watkins and Plaintiff in January 2013 and posted a vacancy announcement for the last available MDO position for which those employees could apply.  Joint Ex. 1 at 28–29; Joint Ex. 12; Trial Tr. at 523:17–525:18.

60. The vacancy announcement for the last available MDO position was posted online from January 29, 2013, through February 13, 2013, on the eCareer website, and HR Manager Lingenfelser made both Watkins and Plaintiff aware of the posting.  Joint Ex. 12; Trial Tr. at 524:14–525:18.

61. Lingenfelser credibly testified that at no time did she tell Plaintiff not to apply for this position, nor did she tell her that McLlwain would never select her.  Trial Tr. at 527:5–528:20.

62. Lingenfelser assumed responsibility for HR functions for the Capital District in 2012, had no personal knowledge of any professional dynamics between McLlwain and Plaintiff, was supporting tens of thousands of postal service employees at that time, and had no conversations with McLlwain regarding her views about selecting Plaintiff for the position.  *Id.*

63. Lingenfelser was the ethics officer for the Capital District and was aware that it would be inappropriate to discourage an employee from applying for a vacancy.  *See id.*

64. Plaintiff did not apply for the vacant MDO position.  *Id.* at 525:19–21.

65.     On February 8, 2013, while the vacancy announcement was still posted, Plaintiff sent a letter to Lingenfelser stating that she would voluntarily accept a down-graded position at Capital Beltway Facility.  *Id.* at 525:22–526:21; Joint Ex. 6.

66.     Because Plaintiff did not apply for the remaining MDO position, she could not be considered for it.  Joint Ex. 12; Trial Tr. at 346:18–348:17.

67.     After Plaintiff informed Lingenfelser that she would voluntarily accept a downgraded position, the last available MDO position was given to Watkins (who is 13 years older than Plaintiff) because there was no longer a mismatch between the number of available MDO positions and the number of MDO employees.  Watkins's Specific Notice of Reduction in Force was formally rescinded on March 1, 2013.  Joint Ex. 16; Trial Tr. at 528:21–532:12.  This process comported with applicable RIF policies and procedures.  *See* Joint Ex. 19 at 20; Trial Tr. at 530:17–532:12.

68.     Plaintiff also did not apply for an open MDO position at the Southern Maryland Plant and therefore could not have been considered for that position.  Joint Exs. 15, 18; Trial Tr. at 348:18–349:9.

69.     Under the official RIF policies, Plaintiff could not be non-competitively assigned to the Southern Maryland MDO position because Southern Maryland was outside of her competitive area; she therefore had to apply to be considered for the position.  Joint Ex. 19 at 7; Trial Tr. at 535:7–537:4.

70.     Jermaine Berrien, who had been acting as an MDO in Southern Maryland, applied for and was selected for the MDO position at Southern Maryland.  Joint Ex. 18; Trial Tr. at 535:2–6.

71. There was no evidence in the trial record regarding Berrien's age, or the ages of any of the other applicants for the position. *See generally* Trial Tr.

72. There was no credible evidence in the record indicating that McLlwain had a pattern or practice of treating younger workers more favorably than older workers.

73. There was, however, credible testimony from McLlwain that she had promoted workers over the age of 40, including Amy Siu, Sylvia Moss, Danielle Bell, Walter Stokes, Sherrod Stanard, and Lonzine Wright. *See id.* at 984:24–985:8.

74. McLlwain also played a role in approving Plaintiff's 2008 promotion to MDO. *Id.* at 461:15–24; 805:1–14.

75. McLlwain also had a record of disciplining relatively older and relatively younger workers equally. For example, when an operational deficiency occurred on Tour 1 in 2012, McLlwain sent disciplinary letters to both Plaintiff—the relatively older Tour 1 MDO—and Wright, the relatively younger MDO. Joint Ex. 3; Def. Ex. 10.

76. Stanard, Wright, and Gramblin testified credibly that they never observed McLlwain being more critical of employees over the age of 40 than younger employees. Trial Tr. at 631:22–632:3; 443:11–14; 758:2–15.

77. After Plaintiff voluntarily transferred to the supervisor position at the Capital Beltway Facility in February 2013, her direct supervisor became MDO Jermaine Berrien, but McLlwain still had operational oversight over the Capital Beltway Facility and Southern Maryland Plant, and visited Capital Beltway to monitor its operations, as well as to supervise Berrien, who was a newly promoted MDO. *Id.* at 834:14–836:8.

78. McLlwain testified credibly that during her visits to the Capital Beltway Facility, she saw Plaintiff "a few times," but only spoke to her on two occasions: first, regarding

"holes" in a mail processing machine that caused decreased machine productivity; and second, on Plaintiff's last day before retirement, when she stated that she was leaving because she "can't walk that floor anymore." *Id.* at 836:9–837:9.

79. McLlwain's testimony that she only spoke to Plaintiff on these two occasions at the Capital Beltway Facility is more credible than Plaintiff's uncorroborated testimony that McLlwain would visit the facility two to three times per week to harass her with a "barrage [of] attacks." *See id.* at 311:3–312:10.

80. McLlwain's testimony was detailed, her ability to recall the specific interaction was clear, and her demeanor was forthright. Her testimony throughout her two days on the witness stand was similarly detailed and often corroborated by other witnesses and contemporaneous documentation, whereas Plaintiff's testimony was often conclusory and contradicted by contemporaneous documentation such as her disciplinary record and October and November 2011 emails conveying her 2011 performance evaluation.

81. McLlwain's testimony was also corroborated by Plaintiff's own testimony that she had to have a hip replacement because she had "[b]een walking that floor for twenty-something year[s]." *Id.* at 313:22–24.

82. Gramblin testified credibly that he never told Plaintiff that she should just retire around the time of the 2012/2013 RIF. *Id.* at 440:18–20.

83. In March 2012, Plaintiff applied for Family and Medical Leave Act ("FMLA") leave to care for her mother. Joint Ex. 9; Trial Tr. at 259:5–18; 971:1–4.

84.    Plaintiff was approved for unscheduled, intermittent leave as needed of up to 480 hours to care for her mother.  Joint Ex. 9; *see also* Trial Tr. at 971:5–7 ("There was no number, because at that point she didn't know how long she would be gone.").

85.    The approval form provided to Plaintiff stated the following:

> Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient.
>
> . . .
>
> The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement: . . .  Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Joint Ex. 9.

86.    McLlwain approved FMLA leave for Plaintiff.  Trial Tr. at 259:5–18; 971:1–4.

87.    JCTM's Manager of In-Plant Support, Sylvia Moss, and employees in the Postal Service's Greensboro Office were responsible for collecting and storing all supporting FMLA documentation.  *Id.* at 971:13–972:4.

88.    The Postal Service requires documentation to support the use of FMLA leave because the agency is subject to audits by the Office of Inspector General ("OIG") regarding leave fraud.  *Id.* at 927:17–928:12.

89.    Although McLlwain approved Plaintiff's leave, McLlwain did not receive the form approving FMLA leave that was provided to Plaintiff.  *Cf.* Joint Ex. 9; Trial Tr. at 1018:6–12.

90.    McLlwain did not track Plaintiff's leave.  Trial Tr. at 971:22–23; 928:8–16. McLlwain testified that Moss tracked Plaintiff's FMLA leave.  *Id.* at 971:22–25; 1059:23–1060:5.

91.    Approximately six to eight weeks after Plaintiff began her FMLA leave, Moss told McLlwain that Plaintiff needed to provide documentation to support her continued use of FMLA leave.  *Id.* at 972:5–12.

92.    Moss did not testify at trial.  There was no testimony or evidence presented as to why additional documentation was needed to comply with the Postal Service's notice and procedural requirements for requesting FMLA leave.

93.    McLlwain asked Moss to prepare a "Return to Duty" letter based on a form letter the Postal Service used to communicate with individuals who are on leave but have not provided sufficient support for that leave.  *Id.* at 972:13–974:1–3.

94.    McLlwain asked Moss to prepare the letter even though she knew that Plaintiff was with her terminally ill mother.  *Id.* 1021:10–17.

95.    McLlwain reviewed and signed the draft letter before sending it on May 16, 2022.  *Id.* at 973:20–974:13; Joint Ex. 2.

96.    The letter informed Plaintiff that it was "an official notice for [her] to report to work or provide appropriate medical documentation no later than five (5) days from receipt of [the] letter."  Joint Ex. 2.

97. The letter included FMLA Form WH-380 for Plaintiff to complete and return if she believed her continued use of leave was covered by FMLA. *Id.*

98. The letter also stated that "[s]hould you fail to comply with these instruction(s), you will be considered as Absent Without Leave (AWOL), which may result in disciplinary action up to and including removal from the Postal Service." *Id.*

99. McLlwain testified that she sent the letter to obtain supporting documentation from Plaintiff so that the documentation would be on file, and to "avoid anything with the OIG, any investigations on me for not having proper documentation for anyone that is on a lengthy absence." Trial Tr. at 975:12–13, 18–24,1022:11–14 ("I have to have documentation on file . . . She just needed to provide the documentation."); 1060:6–12 ("Ms. Moss alerted me that . . . Ms. Vick had not submitted any . . . documentation.").

100. Gramblin, Stanard, and Wright testified that Joint Exhibit 2 was the standard form letter and that they had sent letters with substantively the same language. *See id.* at 446:23–448:6 (Gramblin identifying Joint Exhibit 2 as the Postal Service's standard return to work letter and testifying that he had sent letters with similar language to other employees); *id.* at 652:21–653:18 (Stanard same); 768:9–25 (Wright same).

101. Plaintiff could have responded to the letter by providing the medical documentation, she could have contacted the medical unit, or she could have sent the paperwork with the form that was attached to the letter. *Id.* at 975:1–6.

102. Plaintiff testified that she did not communicate with the Greensboro Office after she was approved for FMLA leave. *Id.* at 1074:3–25.

103. Plaintiff did not provide additional medical documentation regarding her mother's illness in response to the letter from the Postal Service because she had not exhausted her 480 hours of FMLA leave. *See id.* at 263:1–6, 264:4–6.

104. Plaintiff testified that after she received the letter, she spoke with McLlwain on the phone and told her that her mother was not doing well and that it would be hard to return to work, and that McLlwain responded, "I need you back." *Id.* at 263:1–8.

105. McLlwain's recollection of events differed. She testified that after she sent the letter to Plaintiff, Plaintiff called and spoke with McLlwain's administrative assistant, and that during that phone call, McLlwain interjected to "give [Plaintiff] words of encouragement." *Id.* at 975:18–976:7. McLlwain testified that she knew at the time Plaintiff was caring for her mother and did not press Plaintiff about the need for additional documentation. *Id.* McLlwain also testified that she did not demand that Plaintiff return to work. *Id.* at 976:8–13; 1061:6–13.

106. Plaintiff returned to work after receiving the May 16, 2012 Letter. *Id.* at 264:12–13.

107. Plaintiff's mother passed away shortly after Plaintiff returned to work. *Id.* at 264:14–17.

108. Destinating non-Express barcodes need to be scanned so that the Postal Service knows what mail is out for delivery. *Id.* at 977:12–20.

109. The daily scan email to the Manager of In-Plant Support ("MIPS") is necessary so that plant management employees would know that processed mail was completed, dispatched, scanned, and transported. *Id.* at 978:4–18.

110. On June 15, 19, and 21, 2012, and on July 13, 2012, destinating non-express barcodes were not scanned and the daily scan email was not sent to the MIPS.  Joint Ex. 3; Trial Tr. at 977:2–978:22.

111. Plaintiff and Lonzine Wright were responsible for Tour 1 during this time.  Trial Tr. at 978:21–25; 250:14–20.

112. On July 20, 2012, both Plaintiff and Wright were issued a Letter of Warning in lieu of a seven-day Time-off Suspension for failing to ensure that scans for the Destinating non-Express barcodes for JCTM were made on June 15, 19, and 21, 2012, and July 12, 2012.  *Id.* at 976:14–21, 979:4–12, 979:25–980:5; Joint Ex. 3; Def. Ex. 10.

113. The MIPS drafted both letters.  Trial Tr. at 976:22–24.

114. Plaintiff filed a grievance regarding her July 20, 2012, Letter of Warning.  *Id.* at 980:7–9.

115. During the grievance process, McLlwain learned that Plaintiff had not been at work on one of the dates cited in the July 20, 2012, Letter of Warning.  *Id.* at 980:10–15.

116. After learning that Plaintiff was not on duty on one of the days cited in the July 20, 2012, Letter of Warning, McLlwain requested that the July 20, 2012, Letter of Warning issued to Plaintiff be rescinded.  *Id.* at 980:16–981:7, 983:1–2, 983:9–17.

117. On November 20, 2012, Plaintiff was informed that the July 20, 2012, Letter of Warning was being fully rescinded and removed from all records and files.  *Id.* at 981:9–982:14; Joint Ex. 5.

## II.    CONCLUSIONS OF LAW

### A.  ADEA Claims

Plaintiff alleges that Defendant discriminated against her based on age by issuing her a "Non-Contributor" rating for FY 2011, including her position in the 2012/2013 RIF, refusing to place her in an available MDO position, and creating a hostile work environment that resulted in her constructive discharge.

1. Discrete Acts of Discrimination

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Persons forty years of age or older are in the class protected by the statute. *Id.* § 631(a). To prevail under the ADEA, a plaintiff must prove, by a preponderance of the evidence, "that age discrimination was a but-for cause of the differential treatment; the plaintiff does not necessarily need to show that age discrimination was a but-for cause of the personnel decision itself." *Kline v. Weichert*, No. 16-cv-0262, 2020 WL 2615528, at *4 (D.D.C. May 23, 2020) (emphasis omitted) (citing *Babb v. Wilkie*, 589 U.S. 399 (2020)), *aff'd*, No. 20-5220, 2021 WL 5537701 (D.C. Cir. Nov. 23, 2021).

At trial, Plaintiff presented evidence establishing that she is over 40 years old, and that she was given a "Non-Contributor" rating for FY 2011, resulting in her having a lower priority for maintaining her MDO position in the 2012/2013 RIF. Plaintiff has not, however, presented evidence sufficient to establish a causal relationship between her age and any adverse employment action.

As an initial matter, Plaintiff's personal belief that she was discriminated against based on her age, Watkins's conclusory statements that McLlwain harbors age-related bias, and the fact that Stanard and Wright are younger than Plaintiff are insufficient to support an inference that any of the alleged adverse actions were motivated by age discrimination. *See Beard v. Preston*,

576 F. Supp. 2d 93, 103 (D.D.C. 2008) ("[m]ere personal belief" is insufficient to support an inference of age discrimination); *Goss v. George Wash. Univ.*, 942 F. Supp. 659, 664 (D.D.C. 1996) ("mere fact" of age differential between plaintiff and selectee is insufficient to support inference that adverse action was motivated by age).

Plaintiff's claim was also undermined at trial by evidence showing that McLlwain had a record of promoting employees who were older than 40 and disciplining employees who were younger than 40, as well as the fact that Watkins—who is older than Plaintiff—received the third available MDO position, and that McLlwain, Stanard, and Wright were all over 40.  As courts in this district have repeatedly held, "a decision-maker's inclusion in the same protected class as the . . . plaintiff cuts against any inference of discrimination." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017) (collecting cases), *aff'd*, 746 F. App'x 23 (D.C. Cir. 2018).

Defendant also presented evidence of legitimate, nondiscriminatory reasons for giving Plaintiff a "Non-Contributor" rating, subjecting her to the RIF, and "refusing to place her in available MDO positions."  First, regarding Plaintiff's "Non-Contributor" rating, McLlwain testified credibly about the performances of Plaintiff, Stanard, Watkins, and Wright that justified their different performance evaluation scores.  McLlwain's testimony was supported by contemporaneous notes on each employee's evaluation form, testimony from Stanard and Wright about the significant efforts they made on the job that would justify their "Contributor" ratings, and testimony from McLlwain, Stanard, and Gramblin that Plaintiff was ineffective as an MDO.  Second, Defendant presented evidence showing that, pursuant to applicable RIF policies and procedures, Plaintiff's "Non-Contributor" rating caused her to receive a lower priority than Stanard and Wright for obtaining one of the three available MDO positions.  And third, while

Plaintiff claims that Defendants improperly "refused to place her" in any available MDO position, she also conceded that she did not apply for an available MDO position, which meant that she was ineligible for those positions.

Finally, Plaintiff did not present any evidence that the Postal Service's stated reasons for its actions were pretext for discrimination. For example, while a court may "legitimately infer" discrimination if the evidence shows that "the plaintiff [is] significantly better qualified for the job" than a comparator, *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998), Plaintiff did not present evidence that she was more qualified than Stanard or Wright. Regarding Stanard, Plaintiff did not rebut evidence showing that Stanard had been honorably discharged from the military before 2012, and that, pursuant to OPM regulations and the Code of Federal Regulations, he was entitled to preference during a RIF over non-veteran employees, including Plaintiff. And regarding Wright, Plaintiff did not credibly rebut McLlwain's reasons for giving Plaintiff and Wright different evaluation scores. Ultimately, Plaintiff did not show that Defendant's legitimate, nondiscriminatory reasons were false, or that discrimination was the true reason for treating Stanard and Wright differently. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981))).

The evidence also established that Plaintiff received her "Non-Contributor" rating in 2011 and that it was not retroactively planted in the Performance Evaluation System ("PES") as she argued at trial. Plaintiff received autogenerated emails from the PES informing her of the availability of her FY 2011 review in October and November 2011, and time stamps in the PES show that McLlwain's review comments and rating were finalized in November 2011.

To find for Plaintiff under the ADEA, "[i]t is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination" based on age. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (alterations in original) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). Based on the evidence presented, the court does not find by a preponderance of the evidence that Defendant discriminated against Plaintiff based on age in relation to her "Non-Contributor" rating, the 2012/2013 RIF, or failure to place her for any other MDO position.

### 2. Hostile Work Environment

The ADEA also makes it unlawful for an employer to create a hostile work environment based on an employee's age. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1195, 1201 (D.C. Cir. 2008).

To prevail on a hostile work environment claim, a plaintiff must prove "that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In determining whether a hostile work environment exists, the court must consider the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* This analysis is both subjective and objective: "no violation is present 'if the victim does not subjectively perceive the environment to be abusive' or if the conduct 'is not severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 226 (D.D.C. 2015) (quoting *Harris*, 510 U.S. at 21–22). The plaintiff must also show "some connection between the alleged abuse and the plaintiff's protected status." *Golden*

*v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277, 286 (D.D.C. 2017); *see also McKeithan v. Boarman*, 803 F. Supp. 2d 63, 70 (D.D.C. 2011) (dismissing plaintiff's hostile work environment claim because he "offer[ed] nothing to support a claim that any of [supervisor]'s conduct was linked to his age").

Plaintiff claims she was subjected to a hostile work environment because of her age when McLlwain criticized her work performance and her ability to supervise her subordinates, sent her a Letter of Warning, and gave her a "Non-Contributor" rating for FY 2011, as well as when the Postal Service included her in the 2012/2013 RIF and did not place her in any available MDO position.  Regarding the alleged adverse employment actions—the "Non-Contributor" rating, 2012/2013 RIF, and decision not to place her in any available MDO position—Plaintiff, as explained above, has failed to show any causal connection between those actions and her age. The same is true for Plaintiff's additional allegations of harassment.

Plaintiff's primary complaint of harassment was that McLlwain criticized Tour 1 employees during daily Turnover Meetings, and singled Plaintiff out both during those meetings and during Plaintiff's shifts.  Other MDOs, however, testified that these meetings were an opportunity to discuss daily issues that began during Tour 1 that would need to be addressed in the coming shift, as well as broader issues at the plants, thus undermining any inference that McLlwain's criticisms were inappropriate simply because they were given in the presence of others.  Other MDOs also testified that they too received criticism during Turnover Meetings and during their shifts, and that while McLlwain gave criticism in a firm and direct manner, she critiqued all employees regardless of age.  Plaintiff's allegation that she was singled out was thus contradicted by an overwhelming amount of evidence, and she did not show by a preponderance of evidence that McLlwain criticized her because of her age.  Plaintiff also failed to show that

McLlwain created a "pervasive or severe pattern of harassment" by issuing disciplinary letters or that McLlwain sent those letters because of her age.  *See Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 53 (D.D.C. 2015) (dismissing a hostile work environment claim which amounted to a collection of ordinary workplace difficulties).

Plaintiff also did not show by a preponderance of the evidence that she was constructively discharged.  To succeed on a constructive discharge claim, Plaintiff "must show that the employer deliberately created intolerable work conditions that forced the plaintiff to quit."  *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006).  Constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness or . . . its largesse affirmatively increases the appeal of the employee's alternatives."  *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997).

Plaintiff testified that after she transferred to the Capital Beltway Facility, McLlwain would come to the building where she worked to harass her.  But McLlwain testified that in early 2014 she took over as Senior Plant Manager at the Southern Maryland facility and was responsible for all buildings on that campus, including the Capital Beltway Facility, and that she only spoke with Plaintiff twice during that time: once regarding "holes" in a mail processing machine that resulted in decreased machine productivity, and once on Plaintiff's last day before retirement.  Plaintiff did not present any evidence to rebut McLlwain's legitimate, nondiscriminatory reasons for visiting the Capital Beltway Facility and speaking with Plaintiff, and the court credited McLlwain's testimony regarding her interactions with Plaintiff at the Capital Beltway Facility.

Plaintiff also claimed that when she voiced her distress about the 2012/2013 RIF to Gramblin, he suggested that she retire.  Gramblin flatly—and credibly—denied making that statement.  And, even if he had he made it, that statement, along with the other actions Plaintiff alleged to cause her distress, do not combine to make out a case for constructive discharge.  *See Cannon v. Paulson*, 531 F. Supp. 2d 1, 8 (D.D.C. 2008) ("Plaintiff argues that his supervisor's repeated requests that he retire, her decision to bar him from the IRS office building, and her formal evaluation of Plaintiff's performance as only 'fully successful' in 2002, compared to ratings of 'outstanding' in 2000 and 2001, were deliberate attempts to make Plaintiff's working conditions intolerable.  This falls far short of what a plaintiff must show to establish a constructive discharge claim in this Circuit.").

## B.  Family Medical Leave Act Claims

"Two distinct types of claims are recognized under the FMLA: (1) 'interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act,' and (2) 'retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 64 (D.D.C. 2011) (citations omitted); *see also Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43, 49–55 (D.C. Cir. 2011).  Plaintiff asserts both types of claims.  First, she alleges that Defendant interfered with her FMLA leave in May 2012, when McLlwain sent her a "return to Duty/Letter of Intent" and told her "I need you back" at work.  Second, Plaintiff claims that Defendant retaliated against her for taking FMLA leave by

issuing a July 20, 2012 Letter of Warning subjecting her to the 2012/2013 RIF, and refusing to place her in an available MDO position.

An action under the FMLA must be brought within two years of the alleged violation, or within three years if the violation is alleged to have been willful.  29 U.S.C. § 2617(c).  "In the context of FMLA, willful conduct is generally viewed as an employer that knows its conduct to be wrong or has shown reckless disregard for the matter in light of the statute."  *Cooper v. Henderson*, 174 F. Supp. 3d 193, 205 (D.D.C. 2016) (citation omitted); *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent.").  Other Circuits have held that a "negligent violation is not a willful violation, and an unreasonable violation does not necessarily constitute a willful violation."  *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016) (cleaned up); *see also Honeycutt v. Baltimore Cnty., Md.*, No. 06-cv-060958, 2007 WL 1858691, at *3 (D. Md. June 18, 2007) (a violation must involve "more than mere negligence"), *aff'd*, 278 F. App'x 292 (4th Cir. 2008).  Plaintiff bears the burden of proving that the Postal Service "knew or showed reckless disregard" for its conduct governed by the FMLA.  *Iraheta v. Lam Yuen, LLC*, No. 12-cv-1426, 2013 WL 6713219, at *7 (D. Md. Dec. 18, 2013); *see also Cooper*, 174 F. Supp. 3d at 205.

Plaintiff filed her Complaint on December 23, 2014, more than two years after the Postal Service allegedly interfered with her FMLA rights in May 2012.  Accordingly, to prove her interference claim, Plaintiff must show that Defendant's conduct was willful.  Her allegations regarding retaliation, however, occurred on both sides of the two-year line.

     1.  <u>Interference Claim</u>

Under the FMLA, an eligible employee may take "a total of 12 workweeks of leave during any 12-month period . . . to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  The FMLA also states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided . . . ."  *Id.* § 2615(a)(1).  "In order to establish an interference claim under FMLA, a plaintiff must prove, *inter alia*, that (1) the plaintiff was entitled to take leave because [she] or a family member had a 'serious health condition,' (2) the plaintiff provided the defendant with adequate notice of [her] intention to take leave and (3) the defendant interfered with the plaintiff's right to take leave." *Deloatch*, 797 F. Supp. 2d at 65 (citing 29 U.S.C. §§ 2611, 2612, 2615).  Interference claims "include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave" and "manipulation . . . to avoid responsibilities under FMLA[.]" *Williams v. Verizon Washington, D.C. Inc.*, 304 F. Supp. 3d 183, 189 (D.D.C. 2018) (quoting 29 C.F.R. § 825.220(b)).  As previously stated, because Plaintiff's interference claim occurred more than two years before filing her Complaint, she must show that Defendant's interference was willful.  She has not done so.

In April 2012, McLlwain approved Plaintiff's request for FMLA leave, specifically approving her for "intermittent leave as needed up to 480 hours."  Trial Tr. at 971:4; Joint Ex. 9. Though McLlwain approved Plaintiff's request, the Manager of In-Plant Support, Sylvia Moss, and employees in the Postal Service's Greensboro Office were responsible for collecting and storing all supporting documentation.  Trial Tr. at 971:18–972:4 ("When you provide documentation for FMLA, it goes to Greensboro, North Carolina").  Approximately six weeks into Plaintiff's leave, Moss informed McLlwain that Plaintiff was required to submit additional

paperwork to support her ongoing leave. *Id.* at 972:5–12.  Under the governing regulations, "[a]n employer may require that an employee's leave to care for the employee's covered family member with a serious health condition . . . be supported by a certification issued by the health care provider of the employee or the employee's family member."  29 C.F.R. § 825.305(a).  However, "[i]n most cases, the employer should request that an employee furnish certification at the time the employee gives notice of the need for leave or within five business days thereafter, or, in the case of unforeseen leave, within five business days after the leave commences."  *Id.* § 825.305(b).  The employer may nonetheless "request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration."  *Id.*

At McLlwain's request, Moss prepared a "Return to Work/Letter of Intent" form letter for McLlwain to send, requesting that Plaintiff "report to work or provide appropriate medical documentation no later than five (5) days from receipt of [the] letter."  Joint Ex. 2; Trial Tr. at 972:13–24, 974:1.  Plaintiff and McLlwain's testimony differ as to what happened next.  Plaintiff testified that after receiving the letter, she called and spoke with McLlwain who told her, "I need you back."  Trial Tr. at 263:1–19.  McLlwain testified that she sent the "Return to Work/Letter of Intent" to assist the Greensboro office with compiling necessary paperwork and that, to the extent that she spoke with Plaintiff at all in the period immediately following transmission of the letter, it was to interject on a call between Plaintiff and McLlwain's administrative assistant to "give her words of encouragement."  *Id.* at 975:12–976:13, 1022:11–14.  McLlwain testified multiple times that she did not demand that Plaintiff return to work.  *Id.* at 976:8–13; 1061:6–13.  Nonetheless, Plaintiff's obvious distress—even during her testimony—at leaving her mother supports an inference that the letter and Plaintiff's phone call with McLlwain "discourag[ed]" her from using the full amount of her FMLA leave.  *See Williams*, 304 F. Supp. 3d at 189.

Plaintiff, however, provided no evidence to show that McLlwain—in relying on information from Moss—sent the "Return to Work/Letter of Intent" with knowledge that the letter interfered with Plaintiff's FMLA rights, or that in doing so she acted with reckless disregard for Plaintiff's rights. *Cooper*, 174 F. Supp. 3d at 205. Although McLlwain had no apparent "reason to question the appropriateness of [Plaintiff's] leave or its duration," 29 C.F.R. § 825.305(b), the evidence at trial established that McLlwain's logic in sending the letter was defensible. McLlwain sent the letter only after consulting with—and at the direction of—Moss, the person responsible for collecting and storing documentation supporting FMLA leave. Trial Tr. at 971:13–972:12. McLlwain relied on Moss because she did not personally collect paperwork or track FMLA leave. *Id.* at 971:13–23; 928:8–16. McLlwain's intent was not to discourage Plaintiff from taking her approved leave, but to obtain documentation she believed necessary and to "avoid anything with the OIG, any investigations . . . for not having proper documentation for anyone that is on a lengthy absence." *Id.* at 975:12–24, 1022:11–14. And Plaintiff had not in fact communicated with the Greensboro Office after she was approved for leave. *See id.* at 1074:3–25.

The evidence therefore established, at best, a lack of communication between McLlwain—who knew Plaintiff remained in North Carolina to assist her ailing mother, *id.* at 1021:10–17—and the Greensboro Office, which Plaintiff admits she did not communicate with following initial approval of her FMLA leave. Without more, this lack of communication that resulted in the letter to Plaintiff sounds in negligence, short of the standard for proving a willful violation. *See Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008) ("[E]ven if some intent to avoid the FMLA's consequences is evidenced—a finding of willfulness will not necessarily

follow where the employer tried to comport with the law and tenable reasoning undergirded its conduct.").

Furthermore, Plaintiff did not call Moss to elicit testimony showing that her advice to McLlwain was willful or in reckless disregard for the statute.  Without any such evidence, the court finds that this "bureaucratic snafu" amounts to negligence at best.  *Mozingo v. Oil States Energy, Inc.*, No. 3:14-cv-924, 2016 WL 617837, at *3 (S.D. Miss. Feb. 16, 2016), *aff'd*, 661 F. App'x 828 (5th Cir. 2016).  Plaintiff has not cited any authority to support the conclusion that Moss's role in and of itself "constitutes evidence [s]he 'knew or showed reckless disregard for the matter of whether [her] conduct was prohibited' by the FMLA."  *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 450 (5th Cir. 2018); *see also Avent v. Kraft Foods Glob., Inc.*, No. 3:11-cv-37, 2012 WL 3555378, at *6 (E.D. Va. Aug. 16, 2012) (holding plaintiff "failed to set forth any evidence to support a finding" that the defendant "knew or showed reckless disregard for whether its conduct was prohibited by the FMLA").  Without this evidence, the court cannot say that it is more likely than not that McLlwain, or any other Postal Service employee, willfully interfered with Plaintiff's FMLA rights.

2. Retaliation Claims

In addition to prohibiting an employer's interference with an employee's exercise of FMLA rights, the Act also prohibits an employer from retaliating against an employee who exercises those rights: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2).  In order to prevail, Plaintiff must show that she exercised her rights under the FMLA, that she suffered an adverse employment action, and that the two were causally connected.  *Id.*

Plaintiff alleges that Defendant retaliated against her for taking FMLA leave by issuing a July 20, 2012 Letter of Warning, subjecting her to the 2012/2013 RIF, and refusing to place her in an available MDO position. Defendant, however, offered credible evidence demonstrating that it had legitimate, non-retaliatory reasons for taking each of these actions.

As an initial matter, the July 20, 2012 Letter of Warning was rescinded, was not retained in Plaintiff's file, and no actual punishment followed. And even if it had not been rescinded, the letter itself did not constitute an adverse employment action capable of sustaining a retaliation claim. *See Baloch*, 550 F.3d at 1199 (rejecting the premise that a letter of reprimand alone constitutes adverse employment action where it "contained no abusive language, but rather job-related criticism"); *see also id.* ("[C]ourts have been unwilling to find adverse actions where a suspension is not actually served."); *accord Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay that is never served does not constitute an adverse employment action."). In any event, Plaintiff has not demonstrated by a preponderance of the evidence that Defendant sent the Letter of Warning or took any other action against her because she took FMLA leave. As previously explained, Defendant offered legitimate, nondiscriminatory reasons for its 2012/2013 RIF and for not placing Plaintiff in another MDO position. Specifically, evidence showed that pursuant to the Postal Service's RIF policies, Plaintiff's "Non-Contributor" rating, Stanard's Veteran's preference and "Contributor" rating, and Wright's "Contributor" ratings meant that both Stanard and Wright were entitled to preference over Plaintiff in the RIF; Plaintiff did not offer any credible evidence that Defendant's reasons for taking those actions were pretextual. Evidence also showed that following the RIF, Plaintiff did not apply for any available MDO position and instead voluntarily accepted a different position.

Ultimately, the court finds that Plaintiff failed to show by a preponderance of the evidence that Defendant violated the FMLA by interfering with her leave or by retaliating against her.

### III.    CONCLUSION

For the reasons stated above, the court concludes that Plaintiff has failed to establish that it is more likely than not that Defendant discriminated against her based on her age, or that Defendant violated her rights under the FMLA.  The court will therefore enter judgment for Defendant on each of those claims under Rule 58.  A separate Order will issue.


Date:  April 23, 2026


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge